**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case. No. 16-CR-135 (RCL)** |
| | ) | |
| **JESSE A. OLIVIERI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

———————————————————————

## MEMORANDUM IN AID OF SENTENCING

Jesse Andrew Olivieri is a 31 year old man who has been struggling with a largely untreated mental illness for the past ten years. In his early twenties, Mr. Olivieri began experiencing paranoid delusions, believing that he was the subject of a conspiracy and that he was being watched via video cameras. In 2006 and again in 2009, Mr. Olivieri was briefly hospitalized for his illness, but after being discharged, he stopped receiving treatment because he and his family did not realize the extent of his mental illness.

On May 20, 2016, Mr. Olivieri's delusions led him to drive to Washington, D.C. and approach the White House security gate with a gun, pointed toward the ground. Despite commands by Secret Service officers to stop and drop his weapon, Mr. Olivieri kept walking—until a Secret Service agent shot him in the lower chest. Mr. Olivieri was promptly taken to George Washington University Hospital ("GW Hospital") where he continues to receive medical treatment. Since his arrest, Mr. Olivieri has received multiple surgeries and is not expected to fully recover for at least another year.

On September 6, 2016, Mr. Olivieri pled guilty to Resisting or Impeding Certain Officers With a Dangerous Weapon, in violation of 18 U.S.C. § 111 (a) and (b). Because Mr. Olivieri's

medical condition rendered him too ill to come to Court, the guilty plea was entered in his hospital room in the Intensive Care Unit at GW Hospital.   According to the government and Probation Office's calculation, Mr. Olivieri's advisory guidelines range is 8 to 14 months imprisonment.[1]

Mr. Olivieri respectfully requests that the Court sentence him to time served and four months' home detention, to be served at a rehabilitation facility near his family's home that can meet both his medical and mental health needs.   Such a sentence is within the guidelines range of 8 to 14 months as calculated by the government,[2] and is warranted by the factors listed under 18 U.S.C. § 3553(a).

### Factual Background

### I.        Childhood and Teenage Years

Jesse Andrew Olivieri has lived his entire life in Ashland, Pennsylvania.   His father, Michael Kurtis ("Kurt") Olivieri, is 62 years old and worked as a printer.   He is currently retired. Mr. Olivieri's mother, Anne Frances ("Nancy") Olivieri is also 62 years old, and is retired from her employment as a bank teller.   Mr. Olivieri's older brother, Matthew Olivieri also lives in Ashland, Pennsylvania with his wife Erin Olivieri and their two sons.

Mr. Olivieri's parents had another son, Aaron Olivieri.   When he was six years old, Aaron was struck by a car and was killed.   Mr. Olivieri never knew Aaron, as he passed away four years

---

1 As discussed below, Mr. Olivieri objects to the application of a three level enhancement for special offense characteristics under USSG § 2A2.4(b)(1).   Without the three level enhancement, Mr. Olivieri's guidelines range is zero to six months.

2 As discussed below, because the guidelines range as calculated by the government and the Probation Office is in Zone B of the Sentencing Table, the minimum term may be satisfied by, *inter alia*, a sentence of imprisonment that includes a term of supervised release with a condition that substitutes one day of home detention for each day of imprisonment.   Presentence Investigation Report ("PSR") ¶ 90; United States Sentencing Guidelines ("USSG") § 5C1.1(c)(2); USSG § 5C1.1(e)(3).   Because Mr. Olivieri has already served four months imprisonment, he can fulfill the minimum term under the guidelines—eight months—by serving the remaining four months under home detention.

before Mr. Olivieri was born.   Mr. Olivieri's parents divorced when he was 18; however, they have reconnected and currently reside together.

Mr. Olivieri had a happy childhood.   His cousin Colleen Lopko reports that, "when we were kids, we would play for hours on end in a dirt driveway making mud pies, eating fresh pears off the tree and racing our matchbox cars.   We would play in puddles and swing from trees without a care in the world."   Letter from Colleen Lopko.[3]   In addition to doing well in grade school, Mr. Olivieri participated in Cub Scouts, Little League baseball, and played on the high school baseball team.   *See* Letter from Nancy Olivieri.   He met his friend Corey Fetterolf in kindergarten, and they grew close by playing on the same Little League team together.   By the time they were in high school, they "did everything together, to going out daily and riding our 4-wheelers together to having our parents rent us a limo to take our girlfriends to our High School Prom."   Letter from Corey Fetterolf.

Although Mr. Olivieri does not currently have a substance abuse problem, he used alcohol and other drugs as a teenager.   He began drinking alcohol at the age of 13, and used drugs such as cocaine and methamphetamines on the weekends.   He smoked marijuana approximately three days per week, and experimented with pills such as Percocet, Vicodin, and Xanax.   Letter from Carole T. Giunta, Ph.D. to Loui Itoh, Esq. Re: Jesse Olivieri (Sep. 27, 2016) [hereinafter Giunta Evaluation], at 2).   As corroborated by his family, Mr. Olivieri stopped using substances in his early twenties.   *Id.* at 5-6.   Other than drinking alcohol in social settings and taking prescribed medication, Mr. Olivieri does not currently use any substances.

**II.        Mental Illness and Work History**

---

3 Mr. Olivieri's friends, family, doctor, pastor, and other individuals have submitted letters for the Court's consideration at his sentencing, which will be submitted under separate cover.

At the age of 20 or 21, Mr. Olivieri began suffering from a mental health illness.  He experienced paranoid thoughts, as he believed that he was the subject of a conspiracy and was constantly being watched via cameras.  *Id.* at 2.  He thought people were trying to kill him and that he was being chased by demons.  *Id.*  Mr. Olivieri was admitted to Pottsville Hospital for three days, and was diagnosed with Brief Reactive Psychosis, and Paranoid Schizophrenia.  *Id.*

After his discharge, Mr. Olivieri continued to suffer the effects of his illness.  He got into fights with his parents, whom he believed were maintaining surveillance on him and had enlisted people in the community to watch him.  *Id.*  He was hospitalized again at the age of 23, this time at Meadows Psychiatric Center, for ten days.  *Id.*  Upon being admitted, Mr. Olivieri tested negative for substance abuse, but he was diagnosed with Delusional Disorder and Polysubstance Dependence, by History.  *Id.*  Although he was referred to outpatient treatment following his two hospitalizations, he did not seek or receive any treatment because he did not fully appreciate the extent to which he suffered from a mental illness and needed treatment.  *Id.*  His family did not insist that he receive treatment or take his medication because they assumed that the psychotic symptoms were due to his drug use, and were concerned that he had been overmedicated after the second hospitalization.  *Id.* at 4.

Mr. Olivieri's mental illness made it hard for him to engage in activities that most young adults do, such as being involved in a romantic relationship or holding down a steady job. Despite his illness, however, Mr. Olivieri sought to stay employed.  After graduating from high school, he worked as a laborer and a forklift operator in 2005, earning $9 per hour at RFL Logistics in Ashland, Pennsylvania.  PSR ¶ 75.  From 2006 to 2007, Mr. Olivieri worked as a forklift operator with Lowe's Home Improvement in Pottsville, Pennsylvania, where he earned $12 per hour.  *Id.* ¶ 76.  Between 2007 and 2013, Mr. Olivieri worked, on and off, at Rohrbach's Farm

Market, Bakery & Gift Shop in Catawissa, Pennsylvania where his hourly wage started at $5 per hour, and increased to $8 per hour. *Id*. ¶ 77. According to the owners, Ronald and Cathy Rohrbach, Mr. Olivieri "was always very dependable and did an excellent job with whatever he was assigned." Letter from Ronald and Cathy Rohrbach. Mr. Olivieri was also employed by Cressona Aluminum in Cressona Pennsylvania, by Gordon Food Service in Pottsville, Pennsylvania, and by Capstone Logistics in Pottsville, Pennsylvania. PSR ¶¶ 78-80. Most recently, Mr. Olivieri was employed by SAPA Industrial Extrusions in Cressona, Pennsylvania, where he earned $17.50 an hour as a factory employee. *Id.* ¶ 81. He was employed there from March 28, 2016 until May 31, 2016. *Id.*

Mr. Olivieri grew up in the church, and after a period of absence, started to re-attend Grade Bible Church in Catawissa, Pennsylvania in 2008. Letter from Charles J. Busada, Ph.D. After observing that he was faithfully attending Sunday worship and Wednesday fellowships, the pastor of the church, Charles J. Busada asked Mr. Olivieri to join the music ministry, and he agreed. *Id.* Mr. Olivieri also assisted a local chaplain in leading a worship service for truck drivers on Interstate 80 in Buckhorn, Pennsylvania, and diligently applied himself to study the Scriptures. *Id.* According to his pastor, Mr. Olivieri "was real, genuine, deep, and struggling with life; he took life seriously." *Id.*

Mr. Olivieri's mother noted that in recent years, Mr. Olivieri had trouble connecting socially with others. Giunta Evaluation at 4. He lost a lifelong friend, Justin, to a drug overdose in 2013 or 2014. *Id.*; PSR ¶ 58. Mr. Olivieri gave up interests that had previously been very important to him, such as attending church, playing guitar, and going to the gym. Giunta Evaluation at 4. By early 2016, Mr. Olivieri was, according to his mother, less interested in his prior pursuits and engaged in strange behavior, such as believing that his body was not working

correctly and being overly concerned with hygiene. *Id*. He had not been on medication for his mental illness for several years.

**III.        Instant Offense and Hospitalization**

On May 20, 2016, Mr. Olivieri was arrested for walking towards the White House security gate while openly holding a hand gun, and refusing to stop and drop his weapon when ordered to do so by Secret Service officers. After he ignored the officers' commands, he was shot and was rushed to GW Hospital to receive treatment. Mr. Olivieri has been held in custody until he was released on his personal recognizance by Court Order on September 30, 2016. As discussed in greater detail *supra* 11-12, Mr. Olivieri's offense was a product of his mental illness. Giunta Evaluation at 6.

After undergoing multiple surgeries, Mr. Olivieri was discharged from GW Hospital on June 22, 2016 and admitted to the Central Treatment Facility ("CTF") operated by the Department of Corrections. He was re-admitted to GW Hospital from July 3, 2016 to July 7, 2016 for dehydration and diaphoresis, and then discharged again to CTF. PSR ¶ 54. Mr. Olivieri was readmitted to GW Hospital on July 20, 2016, and has been there until the present. *Id.*

According to Dr. Babak Sarani, Associate Professor of Surgery and Chief, Center for Trauma and Critical Care at GW Hospital and one of the doctors with primary responsibility for overseeing Mr. Olivieri's care, the gunshot wound significantly injured the head of Mr. Olivieri's pancreas and duodenum (first portion of the small intestine). Letter from Babak Sarani, MD to Loui Itoh, Esq. Re: Jesse Olivieri (Sep. 7, 2016) [hereinafter Sarani Letter], at 1). Dr. Sarani notes that the injury:

> [R]esulted in the need to resect: a part of his stomach, the head of the pancreas and duodenum along with the insertion of the bile duct into the small intestine. Unfortunately, the bile duct and pancreas could not be connected to the intestines

again (as would normally be done) because of the severe injury to the remaining portions of each organ.   The operation was terminated with the plan to reconstruct the bile duct and pancreas about 4-6 months following injury when the tissues would be amenable to operation.   Unfortunately, about 3 weeks following the initial operation, he developed ongoing and increasingly severe bile and pancreatic leaks from these severed ducts.   We initially attempted to control these leaks with drains but despite maximal effort to do so, Mr. Olivieri's condition worsened from a nutritional and overall constitutional perspective.

*Id.*   In an effort to address these issues, Mr. Olivieri underwent another surgery on September 5, 2016.  *Id.*

Dr. Sarani indicates that after being released from the hospital, Mr. Olivieri would need to be admitted to either an Acute Rehabilitation Unit (ARU) or a Subacute Rehabilitation Unit (SAR) for at least two to three months, where he would receive physical, occupational, and speech therapy.  *Id.* at 1-2.   Both an ARU and SAR offer the type of nursing care that Mr. Olivieri would need, including "wound and drain care and may also include the need to administer tube feeds depending on his ability to eat by mouth."  *Id.*   Due to his debilitated state, Mr. Olivieri also requires help from nurses in carrying out daily activities, such as bathing and using toilet facilities. *Id.*   Even after his initial rehabilitation is complete, Mr. Olivieri will need ongoing abdominal reconstruction and operations in six to nine months, due to having developed a hernia at the top of his abdomen, ongoing bile and pancreatic leaks, and the need to reconnect his bile duct to his intestine.  *Id.*   Dr. Sarani indicated that Mr. Olivieri's "entire treatment course will require at least a whole year from the time of injury," and throughout this time, "he will be in and out of various acute care hospital and rehabilitation hospital settings and will undergo staged operations." *Id.*   In Dr. Sarani's opinion, Mr. Olivieri will not be "whole" and "constitutionally replete for at least 1.5-2 years following injury."  *Id.*

Mr. Olivieri has been receiving psychiatric medication since he was admitted to GW Hospital in May 2016.   Giunta Evaluation at 7.   He has been diagnosed with schizophrenia and his delusions are "much more contained," with medication.   *Id.* at 5, 7.   According to Dr. Giunta, Mr. Olivieri "poses no imminent threat to self or others," and he can be "treated in the community."   *Id.* at 7.   To treat his illness, Mr. Olivieri must receive mental health therapy to monitor and minimize the impact of his symptoms as well as close monitoring of his psychiatric medication to ensure that he is receiving the maximum benefit from his medication.   *Id.*

## Argument

### I.        Objection to the Presentence Investigation Report

The PSR indicates that "[a]s the offense involved physical contact and a dangerous weapon, including a firearm was possessed and its use was threatened, three levels are added" under USSG § 2A2.4(b)(1).   PSR ¶ 29.   Mr. Olivieri objects to the three point enhancement because his offense did not involve physical contact, nor was the use of a dangerous weapon threatened.

The government does not allege that physical contact occurred, nor do the facts support such a finding.   As the Statement of Offense notes, the offense occurred when Mr. Olivieri walked toward the security gate with a hand gun in his right hand, pointed toward the ground. When he ignored the police commands to stop and drop the gun, the police shot him.   There was no physical contact.

Nor did Mr. Olivieri threaten use of the firearm.   Video footage shows that the gun was pointed downward at all times.   No witness attests to seeing him pointing the gun at anyone. Merely walking while holding a gun, pointed downward, does not constitute threatening its use.

### II.       Consideration of § 3553(a) Factors

When imposing a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the United States Sentencing Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

*See* 18 U.S.C. § 3582 (emphasis added).   With that limitation and considering all of the purposes

of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*,

to comply with the purposes [of sentencing]."   18 U.S.C. § 3553(a) (emphasis added).

**(1)      The United States Sentencing Guidelines**

Mr. Olivieri has served over four months in custody.   If the Court does not apply the three

point enhancement, the recommended sentencing range under the United States Sentencing

Guidelines is zero to six months incarceration.

If the Court applies the three point enhancement, a sentence of time served and four months

of home detention falls within the advisory guidelines range of 8 to 14 months incarceration.   *See*

PSR ¶ 89.   Because the guidelines range is in Zone B of the Sentencing Table, the minimum term

may be satisfied by, *inter alia*, a sentence of imprisonment that includes a term of supervised

release with a condition that substitutes one day of home detention for each day of imprisonment.

*Id.* ¶ 90; USSG § 5C1.1(c)(2); USSG § 5C1.1(e)(3).   Because Mr. Olivieri has already served four

months imprisonment, he can fulfill the minimum term under the guidelines—eight months—by

serving the remaining four months under home detention.

Once the Court correctly calculates the sentence that the Guidelines recommend, the Court

must then "make an individualized assessment," considering the remaining factors set forth in

§ 3553(a).   *Gall v. United States*, 552 U.S. 38, 50 (2007).   Because the Guidelines merely reflect

a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s

objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that

actually does achieve § 3553(a)'s objectives in the case before it.   *Rita v. United States*, 551 U.S.

338, 348, 350 (2007).   Consequently, this Court must "filter the Guidelines' general advice

through § 3553(a)'s list of factors."   *Id.* at 358; *see also Gall*, 128 S.Ct. at 598 ("'It has been

uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

Here, the § 3553(a) factors – most importantly, the fact that Mr. Olivieri's mental illness led to his offense, and the fact that his injuries require specialized medical treatment that he is unlikely to receive at a BOP facility – warrant a sentence at the bottom of the guidelines range, of time served and four months home detention.

**(2)    The Nature and Circumstances of the Offense**

Mr. Olivieri's offense was serious.   He approached the White House security gate with a loaded gun, and disobeyed the officers' commands to stop and drop his weapon.   Not only did the offense result in Mr. Olivieri being shot, but his actions had a significant impact on the staff, visitors and other people who work in the White House complex.   Mr. Olivieri takes responsibility for his actions and does not seek to minimize his conduct.   He never meant to hurt anyone, and he deeply regrets what he has done.

While it does not excuse his conduct, it is important to note that Mr. Olivieri's offense was, according to mental health expert Dr. Giunta, "a product of Mr. Olivieri's mental illness and was undertaken impulsively with very little planning."   Giunta Evaluation at 6.   Mr. Olivieri cannot clearly articulate what he was hoping to accomplish by walking towards the White House with a loaded gun.   At times, he indicated that he wanted to get the officers to shoot him; at other times, he gave "convoluted explanations" rooted in his delusional beliefs that he is the subject of a conspiracy and that scientists control his mind.   *Id.* at 7.   Both accounts, according to Dr. Giunta, are "reflective of his mental illness."   *Id.*

As the government acknowledges, Mr. Olivieri did not intend to harm anyone. Government's Sentencing Mem. at 1. Mr. Olivieri "has consistently reported that he had no intent to harm anyone during the instant offense," Giunta Evaluation at 7, and this is consistent with what he told his parents after his arrest. *Id.* at 5 (noting that both of his parents stress that Mr. Olivieri deeply regrets his actions and did not want to hurt anyone).

(3)      **The History and Characteristics of the Defendant**

A.      **Mr. Olivieri Suffers from Severe Mental Illness**

As stated in the Policy Statement in USSG § 5H1.3, "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Although Mr. Olivieri has agreed not to request, and does not request, a departure under this provision, his mental and emotional conditions support the requested sentence at the bottom of the guidelines range. For the past ten years, Mr. Olivieri has suffered from paranoid delusions which caused him to believe that he was the subject of a conspiracy who was being monitored via videocameras and that scientists and "the CIA or someone else really smart" had infiltrated his head and controlled his actions. Giunta Evaluation at 2-3. Although Mr. Olivieri had been hospitalized twice for his mental illness, he had not received treatment or taken medication for the years preceding his offense, due to the fact that he and his family did not appreciate the extent of his mental illness and the need to treat it. *Id.* at 4, 6. According to Dr. Giunta, "[t]hey attributed his unusual thoughts and experiences to his prior substance abuse and were perceiving him through the lens of hope that his condition was improving." *Id.* at 6. Mr. Olivieri and his family are now aware that he has a serious mental illness and are eager for him to receive treatment.

Suffering from mental illness does not excuse Mr. Olivieri's conduct.   However, this is one of the factors that must be taken into account pursuant to § 3553(a)(1), and weighs in favor of a sentence at the low end of the guidelines range.

### B.     Despite His Illness, Mr. Olivieri's Past Behavior Demonstrates Extraordinary Charity, Integrity, and Service to Others

Mr. Olivieri's past behavior demonstrates extraordinary charity, integrity, and service to others, and supports a sentence at the bottom of the guidelines range.  *C.f.*, *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming six-level downward departure for a defendant who, *inter alia*, acted as a "Good Samaritan," demonstrating his commitment to helping persons in distress); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming four-level departure to probation based on defendant's good work where defendant organized and ran youth football team in depressed area); *United States v. Warner*, 792 F.3d 847 (7th Cir. 2014) (affirming probationary sentence where guidelines range was 46 to 57 months due to defendant's exceptional acts of charity and demonstrated concern for the welfare of others).   Despite suffering from severe mental illness, Mr. Olivieri is an exceptionally compassionate individual who has extended extraordinary acts of kindness to loved ones and strangers alike.   His character, as attested to by numerous letters submitted by his friends and family, further weighs in favor of a sentence at the bottom of the guidelines range.

Mr. Olivieri's loyalty, kindness, and support for his friends during their times of need have had a lasting impact.   When Corey Fetterolf considered dropping out of college, Mr. Olivieri encouraged him to stay in school.   According to Mr. Fetterolf, "[h]e told me I would regret it and that stuck with me and with his positive words I stayed in school."   Letter from Corey Fetterolf.

Because of Mr. Olivieri's support, Mr. Fetterolf was able to become a teacher and has been teaching and mentoring youth for the past nine years. *Id.*

Mr. Olivieri also played a significant role in helping Eric Zendrosky overcome his drug addiction. Mr. Zendrosky wrote, "Jesse never turned his back on me. He stood by my side the whole way through. While my whole world fell apart Jesse never judged me. He helped me. He actually helped me get sober in a way. He would keep me company and hang out with me and keep me busy and occupied so that I wouldn't go back to my addiction and give up on my sobriety." Letter from Eric Zendrosky.

According to those who know him, Mr. Olivieri was "the type of guy that would give someone the shirt off his back." *Id*. He exhibited that type of generosity even at a time when he needed money. PSR ¶ 47 (citing Nancy Olivieri). When Mr. Olivieri was between jobs, he had hoped to sell his guitar for $800, but upon meeting the individual who was interested in buying the guitar, Mr. Olivieri learned that the individual had one full leg and one half leg amputated. *Id.* Mr. Olivieri then gave the guitar to the individual, because "he did not have much money and really wanted to play." Letter from Kurt Olivieri.

Before she passed away, Mr. Olivieri lived with his grandmother and helped to care for her as she struggled with the effects of aging. He cooked and cleaned for her, and drove her to the grocery store and to her medical appointments. Letter from Kurt Olivieri; PSR ¶ 47 (citing Nancy Olivieri). Mr. Olivieri currently lives with his father, who appreciates his help in "doing many of the chores it take[s] to maintain a house out in the country." Letter from Kurt Olivieri. Mr. Olivieri is reportedly an "outstanding" uncle to his nephews Jacob, age 13, and Aiden, age eight. Letter from Matthew Olivieri; PSR ¶ 47 (citing Nancy Olivieri). Mr. Olivieri regularly spends time with them watching movies, playing games, and teaching them about music and baseball.

Letter from Kristen Weber; PSR ¶ 47 (citing Nancy Olivieri).   Jacob and Aiden have missed Mr. Olivieri's presence since his arrest.   PSR ¶ 47 (citing Nancy Olivieri).

Despite his struggles, Mr. Olivieri worked hard at his many jobs, and earned the trust of his employer.   According to the owners of Rohrbach's Farm Market, Mr. Olivieri "was very courteous and responsible with the lives of children and adults that he drove on hayrides to and from their designated areas.   Our secretary made the comment that she would take Jesse anytime to work with her as he was always on time and did a great job for her.   We considered Jesse a very good employee."   Letter from Ronald and Cathy Rohrbach.

Mr. Olivieri's friends and family paint a consistent picture of him as a selfless, kind, and caring individual who has had a tremendous positive impact on those around him.   As they have noted, his extraordinary compassion and consideration of others is remarkable in light of the pain that he has suffered as a result of his mental illness.

### (4)    The Purposes of Sentencing

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant.   Here, the Court can fully achieve these sentencing goals without imposing an additional term of incarceration.   Given Mr. Olivieri's injuries, additional incarceration would be unnecessarily harsh.

When considering whether additional incarceration is necessary to serve the purposes of sentencing, the Court should consider the punishing effects that pretrial detention has had on Mr. Olivieri.   As described earlier, Mr. Olivieri has suffered significantly as a result of his gunshot wound.   Not only did he suffer from the initial pain and trauma of being shot, but he has suffered

from infection and additional complications resulting from his wound and the difficulty that the Department of Corrections has had in caring for him, which has resulted in him being shuttled back and forth between CTF and GW Hospital.   Although pretrial detention is not intended to punish, the unintended consequences of Mr. Olivieri's detention have been severe and punishing. For this reason, courts have found it proper to impose lower sentences for defendants who have been shot or severely injured by the police.   *See, e.g.*, *United States v. Clough*, 360 F.3d 967 (9th Cir. 2004) (remanding to district court to consider whether to depart downward where defendant was shot by police during arrest because his "significant injuries" constitute a continuing form of punishment); *United States v. Mason*, 966 F.2d 1488, 1496 (D.C. Cir. 1992) (indicating that being shot by the police *could* constitute punishment and justify a lower sentence, but finding that the principle did not apply in the instant case where the defendant was shot by other criminals).

There is no need for a sentence of incarceration to protect society from any future crimes by Mr. Olivieri.   Mr. Olivieri deeply regrets his conduct.   And, despite his illness, Dr. Giunta determined that "Mr. Olivieri poses no imminent threat to self or others."   Giunta Evaluation at 7. According to her, "the most central factor relevant to Mr. Olivieri's future risk of violence is the extent to which his mental illness is effectively treated."   *Id.* at 6.   The instant offense was the product of Mr. Olivieri's largely untreated mental illness, and the only known instance of him engaging in violent conduct.   *Id.*   Prior to his offense, Mr. Olivieri and his family were not aware of the extent to which he suffered from mental illness.   *Id.*   Now, they are fully cognizant of his illness and are committed to making sure he receives the necessary treatment and medication to ensure that he never engages in this type of conduct again.   *Id.* at 7.

**(5)      The Need for the Sentence to Provide the Defendant with Needed Medical and Mental Health Treatment**

16

Section 18 U.S.C. 3553(a)(2)(D) directs the Court to fashion a sentence that provides Mr. Olivieri with necessary "medical care" or other "treatment in the most effective manner." The Sentencing Reform Act has promoted the identical goal in a non custodial setting by "reject[ing] imprisonment as a means of promoting rehabilitation." *Mistretta v. United States*, 488 U.S. 361, 367 (1989).

A sentence of time served, plus four months' home detention is appropriate, considering that Mr. Olivieri's treatment needs are better met in a non-custodial setting and with the support of his family. Mr. Olivieri continues to suffer from medical complications which require him to receive care from an Acute Rehabilitation Unit or Subacute Rehabilitation Unit for at least two to three months following his discharge from GW Hospital, followed by ongoing abdominal reconstruction and operations in six to nine months. Sarani Letter at 1-2. In addition, Mr. Olivieri continues to suffer from paranoid delusions and requires both ongoing therapy and psychiatric medication. Giunta Evaluation at 7. Working with Mr. Olivieri's family, undersigned counsel has identified two medical facilities close to Mr. Olivieri's home, each of which can meet both his mental health and medical care needs.

Based on Dr. Giunta's recommendation that his family be involved in his recovery, Mr. Olivieri's mental health treatment needs are better met in a medical facility close to his family's home. She wrote, "[f]amily should be included in some sessions with his mental health provider to educate them about his diagnosis of Schizophrenia and to enlist their support and assistance in monitoring his behavior for decline in functioning or onset of symptoms." *Id.* Dr. Giunta also noted that Mr. Olivieri is "fortunate to have involved family who now understand more about his mental illness and remain committed to providing support and assistance to him." *Id.* Mr. Olivieri is committed to addressing his mental illness in order to become a healthy individual and a

17

productive member of society.   He has a strong network of friends, family, and fellow

churchgoers who are eager and ready to support him in this endeavor.   Enabling him to recover at

a facility close to his loved ones is more likely to ensure a speedy and successful recovery than

while isolated in a custodial setting.

Mr. Olivieri's medical needs are also better met outside of prison.   If the Court imposes an

additional term of incarceration, Mr. Olivieri would serve that term within the Bureau of Prisons

("BOP"), which, like the Department of Corrections, will likely struggle to meet his complex

medical needs.   While BOP strives to provide adequate medical care to all inmates, there have

been numerous reports of inadequate care even for the most common disorders.   In a 2008 report,

the Inspector General of the Justice Department criticized the health care provided by BOP.   *See*

U.S. Dept. of Justice Office of Inspector General, *The Federal Bureau of Prison's Efforts to*

*Manage        Inmate        Health        Care*        (Feb.        2008),        *available        at*

www.justice.gov/oig/reports/BOP/a0808/final.pdf   (visited Sep. 30, 2016).   According to the

report, "each of the BOP institutions we tested did not always provide recommended preventive

health care to inmates.   Our audit found that for almost half of the preventive health services we

tested, more than 10 percent of the sampled inmates did not receive the medical service."   *Id.* at ii.

In addition, "[t]he BOP's Program Review Division also has identified instances where

institutions did not provide required medical services to inmates."   *Id*. at 32.   The report found

"that BOP institutions did not always provide inmates with the medical services expected by BOP

management and identified in BOP guidance," and in sixteen institutions, "inmates with chronic

care conditions were not monitored as required."   *Id*. at 32, 34.   Similar findings have been made

by independent investigators.   *See The Health and Health Care of U.S. Prisoners:   Results of a*

*Nationwide Survey*, American Journal of Public Health (April 2009); *Curing the BOP Plague with*

*Booker:   Addressing Inadequate Medical Treatment the Bureau of Prisons*, 41 John Marshall L.R. 219 (2007).

A recent study by the Office of the Inspector General demonstrates that the problems with medical services within BOP persist.  *See* U.S. Dept. of Justice Office of Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016), *available at* https://oig.justice.gov/reports/2016/e1602.pdf (visited Sep. 30, 2016).   According to the report issued earlier this year, the BOP has a difficult time recruiting medical professionals, and staffing shortages are widespread.  *Id*. at i.   Only 83 percent of available positions are filled.  *Id.*   The shortage at twelve institutions is at "crisis level."   *Id.*   In fiscal year 2014, twenty facilities had a vacancy rate of 20% or higher, and three facilities had a vacancy rate of 40% or higher.   *Id.* at 2. As the Office of the Inspector General found, medical staffing shortages limit inmate access to medical care and can impact prison safety and security.   *Id.*

Given Mr. Olivieri's challenging medical needs and the problems BOP has had with providing even basic medical care, there is a risk that he will not receive the care he needs if he is incarcerated.   Particularly in light of the pain he has suffered thus far, he should not be exposed to that risk.

## Conclusion

For all of the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Jesse A. Olivieri respectfully moves this Honorable Court to sentence him at the bottom of the sentencing guidelines range and impose a sentence of time served and four months of home detention.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


        /s/
_____

MARY MANNING PETRAS


        /s/
_____

LOUI ITOH
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.   20004
(202) 208-7500